# The Lackawanna Iron and Coal Company *versus* Fales.

1. The plaintiff's title in ejectment was on a tax title 30 years before suit; in the treasurer's deed was a receipt for the consideration in full and the cost of the surplus bond: the plaintiff had paid the taxes since the purchase and had recovered against the grantor of the defendant for trespass on the land: the judge charged that from these circumstances the jury might presume that a bond had been given: *held,* not to be error.

2. Under such circumstances the maxim *omnia præsumuntur esse rite acta,* should be conclusive in the absence of countervailing evidence.

3. Residence on land with bonâ fide intention to hold it as owner or for the owner, performing labor on it, such as mining ore and the like in the character of owner would give it the character of *seated*.

4. The temporary residence of a trespasser to take timber, whilst it might justify treating the land as seated and a call upon him for the taxes while in his possession would not fix its character as seated after he had left it.

5. Hazzard *v.* Trego, 11 Casey 9, Alexander *v.* Bush, 10 Wright 62, commented on.

March 15th 1867.    Before WOODWARD, C. J., THOMPSON, STRONG and AGNEW, JJ.    READ, J., at Nisi Prius.

Error to the Court of Common Pleas of *Luzerne county*.

In the court below an action of ejectment was commenced, March 28th 1865, by George Fales against the Lackawanna Iron and Coal Company, for a tract of land containing about 372 acres.

The land in dispute was patented, September 5th 1794, to Jeremiah Warden and others, for Mary Wright: it was sold as unseated land for taxes in the name of Mary Wright, on the 14th of June 1836, to H. B. Wright, for $18.93. The entry on the treasurer's sale book showed that the taxes and costs, including the costs for bond, were $12.93, and the surplus $6. The treasurer's deed was acknowledged November 18th 1836. The deed recited the taxes and purchase-money, but did not recite the giving of a surplus bond. On the trial the plaintiff proved by the prothonotary that he had searched for a bond from Wright, but found none, and that there were a few bonds "strewn around occasionally." The court permitted the treasurer's deed to be given in evidence, "the effect to be in the control of the court."

The plaintiff then gave in evidence subsequent conveyances, by which the title of H. B. Wright vested in him November 4th 1847. He proved also, by Mr. McClintock, a member of the bar of Luzerne county, who had been admitted in 1836, that the form of treasurer's deed by which the land had been conveyed to Wright had been in use until within a few years, whether a surplus bond had been given or not. He proved further, by S. D. Lewis, that he had been treasurer of the county in 1830, and again in 1848-9, and had lived in the county for more than fifty years, and that the same form of deed was used, whether a bond was given or not; that he used the same form from first to last; that he found this form of blanks in the office, and left them there. The defendants showed from the commissioners' list that this land in 1852-3 was assessed in the name of Mary Wright as unseated land, and sold for taxes of those years, and conveyed by the treasurer to William P. Stevens, on the 24th of June 1854, for $628.66 ; that after Stevens's death the land was sold by order of the Orphans' Court as his property, and his title vested in the defendants on the 1st of July 1864. It also appeared in his evidence that Stevens was in possession of this land as early as

[Lackawanna Iron Co. v. Fales.]

1847, under a claim of one John Myers, and in 1850, the plaintiff, Fales, brought against Stevens and others an action of trespass *quare clausum fregit* in relation to this tract; to this suit Stevens pleaded "not guilty," and "*liberum tenementum,*" and on the 18th of January 1858, the plea of *liberum tenementum* was withdrawn, and "judgment for the plaintiffs for $1 and full costs." The plaintiff, in rebuttal, gave evidence of buildings being on the tract, 1849, 1852 and 1853; of its assessment on the seated list in 1851, 1852, 1853, 1854 and 1855, in the name of Stevens; that it was marked seated by direction of Stevens; that Stevens was what was called a land pirate. There was also some evidence of the payment of road taxes of 1852, and of another year about that time; also similar evidence as to the payment of school taxes; also evidence of the land being on the unseated list in the name of Mary Wright for the years 1850, 1851 and 1856 to 1859, and the taxes paid by Fales; also that it was sold to the commissioners for taxes of 1860–1 in the name of Mary Wright, and redeemed by Fales August 11th 1862. There was evidence by the defendant that the buildings on the tract were temporary structures for lumbering, none for the purpose of cultivation, and that there never had been any cultivation of any kind of the tract.

The court (Conyngham, P. J.) having explained to the jury the nature of the case, charged further:—

" The first question is, as to the title of the plaintiff; because, if that is defective, the defendants are entitled to a verdict.

" The tract of land in dispute was taken out of the Commonwealth by Mary Wright, and patented to Warden & Co.; its location is not disputed. The plaintiff claims under a sale for taxes, made to H. B. Wright in the year 1836, and this title of Mr. Wright subsequently by due and proper conveyances vested in the present plaintiff; if the title of Mr. Wright was good, and has not since been divested by other proceedings shown here by the defendants, the plaintiff should recover.

" Wright's title is under a tax sale, and the objection made to it is, that the sale of the tract by the treasurer was for more than the amount of taxes and costs, and 'it is not shown directly, nor is it so recited in the deed, that any bond for such surplus was given to the treasurer; if this was the fact, that no such bond was given at the time of the purchase and acceptance of the deed, and it is not established before you as having been so given by the circumstances in evidence, the alleged sale to Wright and the title under it will be good for nothing, and the plaintiff cannot recover here. There is no statute of limitations which will save his claims if there be this defect in its commencement.

[" This raises a question of fact for you; no bond is recited in the deed and none can be found in the prothonotary's office.

but the plaintiff contends that there are circumstances in the case from which you may fairly and reasonably presume and infer that the bond was duly given and has been lost, so that it cannot now be found. It is certainly unfortunate that Colonel Wright had unexpectedly left home, as the plaintiff's counsel alleged, without their knowledge, for he could have testified to the fact, it is supposed, one way or the other. We cannot however regard this, but must dispose of the question upon the other circumstances in the case, from which the plaintiff contends you should presume and find the execution and delivery of the bond at the proper time, and its loss subsequently by the treasurer or in the prothonotary's office.] The facts have been fully argued before you. The defendants rely on the absence of the bond, the neglect to account for it, and the words of the deed making no allusion to it, and reciting the whole consideration as paid in money ; for if literally, the whole consideration was paid in money to the treasurer without a bond, it would be a fatal defect.

" The plaintiff on his part explains the difficulty with regard to the deed, by the testimony of Mr. Lewis and several others ; this was according to the form always used at that time, when bonds were given or when none were required ; the fact that great official neglect as to the preservation of these old bonds is evident from the evidence of the present prothonotary ; the charges by the treasurer of the item of costs for taking a bond, which would have been a false charge if no bond had been given ; the fact that the deed alleges the discharge or payment of the whole consideration, part of which would properly be the giving and receiving of a bond ; the constant claim of the plaintiff and those under whom he holds title, by payment of taxes for so long a time ; the bringing of his suit in 1850 against the alleged trespassers and its final disposition, and the great length of time since the sale—now thirty-two years ; these matters, as you may find them to be from the evidence, are argued before you as reasons and grounds, why you should be satisfied, and at this late day presume that such a bond was duly given.

" It is all submitted to you under the views which the counsel on the one side and the other have pressed before you, and we say, if no such bond was given, the plaintiff cannot recover ; [but if you find reason to presume and infer that the bond was duly given by the purchaser at the tax sale, though now lost or mislaid, so far the plaintiff will have made out a primâ facie title to the land good, unless defeated by the title claimed upon the part of the defendant.]

" The defendant, on his part, shows that in 1854 William P. Stevens purchased the same tract at treasurer's sale, and claims that this vested in him a good title, which has since become vested in the defendants. Primâ facie, upon the face of the papers, this

[Lackawanna Iron Co. *v.* Fales.]

would seem to be so, and if it be a good and available title, it will defeat the claim of the plaintiff.

" In order to make such a tax title good, the land must have been duly assessed as unseated, and must have been at the time of the assessment an unseated tract. Was it unseated late in the fall of 1851 or 1852, when the assessments of 1852–53 were made ?

" You will remember the evidence upon this subject and will decide upon the facts: it is claimed by the plaintiff that it was seated by William P. Stevens, a house put up there, timber cut by himself and others, who contracted with him for the purchase of it. In the fall of 1852 Whitbeck says Polhemas was cutting there, and hauling off in the spring of 1863. The question whether seated or not is for you to decide. [A tract may become seated without permanent residence, and without cultivation through the raising of grain and crops, either of which would clearly make it seated. Some tracts may be entirely unfitted for cultivation, or for a permanent dwelling-place, and yet they may become seated by a personal use of them in the only way in which they can be used.] [When a man honestly claiming to be the owner of a tract of unseated land enters upon it, and there locates himself by his workmen and hands, putting up a house for their occupation and conveniences, with the view of permanently claiming and keeping the land, giving his attention to the cutting and making of lumber upon the place, and he is thus in the actual occupation of the land at the time the assessment is being taken, the tract may be regarded by the assessor as seated, and the personal tax upon the occupier, claiming to be the owner, would be correct and right, and the property is correctly taxed as seated.] We do not mean to say that a mere trespasser or assumed claimant—timber stealer as he is often called—going upon land with a view of taking off the timber as fast as he could do, and then abandoning the property without any view to an actual or permanent occupation, would make the tract seated; [we say it must be the going on under color of title with an evident claim of ownership, and a view to a permanent occupation of the property, and occupying and using it continuously in the way its capabilities render it apparently most proper, that will make it seated.] It is for you to ascertain whether Stevens's occupancy was of this clear and satisfactory character, showing his continuous occupation and permanent intention.

" We learn by the deed to Mr. Winchester that Stevens claimed to hold a portion of this tract as early as 1847, under some claim of right in one John Myers, for which there was a price due. In August 1850, he pleads to the trespass suit of the plaintiff *liberum tenementum*, claiming title in the land ; in 1851, if Mr. Stark, the assessor, be correct, he leaves what is called the Myers and

[Lackawanna Iron Co. *v.* Fales.]

Wright lots to be marked as *seated* on the assessment, and it is contended here, has the same land taxed to himself as *seated*, and the same character of assessments is continued through the assessments of 1852 and 1853.   Whether the Wright tract is the same land covered by the property assessed to himself as *seated*, is for you to ascertain.

" Under these and all the other circumstances as to the manner of occupying, in evidence, as argued before you by the counsel, was this tract at the time of the assessments supporting the sale to Stevens, seated or unseated ?   If it was seated, the sale to him was good for nothing ; if it was unseated, then another question arises for our consideration.

" Was the land assessed to Stevens on the seated list in Lackawanna township, for the years 1852 and 1853, intended for the land now in dispute ?   This is matter of fact for you under the evidence.   If Mr. Stark be correct, when this assessment started in 1851, this would seem to have been Stevens's intention and desire, but whether this be correct or not you will say ; and if you find it so, then were all the taxes which could legally be collected by a sale for unseated land taxes in June 1854, actually previously paid by Stevens or collected of him ?   If so, even though the tract was really unseated, the payment of the taxes by Stevens would prevent a sale of the tract for the taxes assessed upon it as unseated.   In order to decide whether it was sold for any taxes unpaid, you will understand that no road taxes could be legally considered in such a sale, except those which had been certified a year previous to the day of sale, nor could any school tax authorize a sale which had not been assessed and due, and unpaid one year at the time of the sale.

" If those taxes which were then legally collected were not all so paid, then another question may still arise for your disposition, even if the tract was unseated, and all the taxes had not been paid.

[" We say to you that if W. P. Stevens alleged himself to be the owner of this tract, gave the plaintiff notice of this claim by placing on the record of the trespass suit his plea of freehold or *liberum tenementum*, alleged to the assessor Stark in 1851 that the tract was seated by him, and required him to return it as seated, and to assess it to him as such in the seated list, and not to assess it as unseated, an entry to which effect was also copied in the commissioners' transcript-book for 1850–51, and the assessment thus made as seated was continued through the assessments of 1852 and 1853, Stevens being a man from whom such personal taxes could be collected, as must be evident from the other property which it appears he possessed (however it might be if a stranger had become the purchaser at the sale of 1854), we cannot but think that Stevens could not acquire a title under such a sale,

[Lackawanna Iron Co. v. Fales.]

even if some of the taxes assessed upon him for this land remained unpaid. If the tract had really been seated by Stevens, no one would have been called upon to pay the taxes upon it as unseated, and if it was not seated, *but Stevens, for the dishonest purpose of helping to get off the timber and aiding his claim*, pending the suit against him, with his home on the premises, chose to make an apparent seating, and to place upon the official records, through and by the misleading of sworn officers, a false representation, calculated to make Fales indifferent to the payment of the unseated taxes and careless as to his rights, and the jury think, did thereby mislead him and cause him to neglect the payment of the unseated taxes as contended here, we would hold that Stevens and those claiming under him, and having notice by the records in the commissioners' office, would be in a suit like this estopped from alleging and setting up the falsehood and misrepresentation so calculated to deceive, for his or their own benefit, and to the injury of the plaintiff.''']

The jury found for the plaintiff.

The defendants assigned for error the several parts of the charge enclosed in brackets.

*A. Hand*, for plaintiff in error, cited Wallace *v.* Scott, 7 W. & S. 248; Watson *v.* Watterson, 4 Barr 214.

*D. C. Harrington*, for defendant in error, cited Shaw *v.* Boyd, 2 Jones 215; Trego *v.* Huzzard, 7 Harris 441; Best on Presumptions 78, § 67; Fowler *v.* Jenkins, 4 Casey 178; Wallace *v.* Maxwell, 1 J. J. Marshall (Ky.) 447; Wray *v.* Ho-ya-pa-nubby, 10 S. & M. (Miss.) 452; Houston *v.* Perry, 3 Texas 390; Bank of United States *v.* Danbridge, 12 Wheat. 70; Iddings *v.* Cairns, 2 Grant's Cases 88; Alexander *v.* Bush, 10 Wright 66; Acts of March 13th 1824, § 5, Purd. 992, pl. 18, 8 Sm. L. 291; March 30th 1811, § 1, Purd. 876, pl. 53, 5 Sm. L. 251; Miller *v.* Hale, 2 Casey 432; McCall *v.* Lorimer, 4 Watts 351; Laird *v.* Hiester, 12 Harris 452; Woodside *v.* Wilson, 8 Casey 56; Troutman *v.* May, 9 Id. 455; Russel *v.* Werntz, 12 Harris 346; Rosenberger *v.* Schull, 7 Watts 390; Sheaffer *v.* McCabe, 2 Id. 421; Keating *v.* Williams, 5 Id. 383; Kennedy *v.* Daily, 6 Id. 273; Campbell *v.* Wilson, 1 Id. 503; Monongahela Ins. Co. *v.* Chester, 7 Wright 494.

The opinion of the court was delivered, May 13th 1867, by

Thompson, J.—The contest is between tax titles in this case. The defect alleged to exist in that of the plaintiff below, by the plaintiff in error, and defendant below, is that no surplus bond for the sum bid over and above the taxes and costs was shown to have been given to the treasurer by the purchaser, as is required

[Lackawanna Iron Co. v. Fales.]

by the provisions of the Act of 1804. It has always been held that such a bond is indispensable to the validity of a sale for taxes, but whether, after a great lapse of time, it may not under certain circumstances be presumed in the absence of proof of the fact, is a question. The learned judge of the Common Pleas was of opinion and so charged the jury, that they might presume that a bond was given by the purchaser at the tax sale, under whom the plaintiff claims from the lapse of time, near thirty years, which had occurred—the payment of taxes during that time, the assertion of title and ownership by instituting suit for trespass against the grantor of the plaintiff in error and recovering against him, and the receipt on the deed for the consideration in full and for the cost of a bond. If a presumption of law arise out of such facts, it is equivalent to proof of the fact itself, and does not disturb the principle of the necessity of giving the bond. It is certainly a case in which it seems reasonable that the fact should be aided by presumption after the lapse of time which gives rise to a presumption of payment of a judgment or bond, and in many instances of a grant; because it is especially the duty of the officer making the sale to demand the bond, and preserve the proof of it by filing it among the records of the court, when it becomes the duty of other public officers to keep it carefully. These are considerations of great force for the operation of the doctrine of presumption after a great lapse of time. Usually treasurers' deeds contain a printed receipt for a bond, and when that is signed, or it is acknowledged in the body of the deed, it has always stood as primâ facie proof that the bond was given. But in the plaintiff's deed no such receipt was in the deed, and it was not the practice at that time so to print them, we learn, in Luzerne county. We think under these circumstances the learned judge committed no error in this portion of his charge. In Hazzard v. Trego et al., 11 Casey 9, we in fact decided this point, by our unqualified assent to the ruling of the court below, "that the delivery of the deed by the treasurer;—the charge on the back of the deed for the bond, the receipt appended, that he had received the consideration agreeably to law, and the lapse of time nearly twenty-four years," presented a state of facts from which, in the absence of countervailing evidence, the jury might presume that the bond had been given.

Without discussing the point in extenso, my brother Read said, "The court were correct in their answers to the defendant's 5th and 6th points."

The 5th point contained the doctrine of the presumption affirmed by the court.

Afterwards in Alexander v. Bush, 10 Wright 62, the question was again touched, and in the opinion of the late Chief Justice Lowrie, the doctrine is assented to, although for reasons given,

5 P. F. Smith—7

[Lackawanna Iron Co. *v.* Fales.]

that case did not seem altogether favorable to the presumption ; but it was thought that where no reference to a bond appeared in the deed, it ought to have been shown that the deed was not special, but in the usual form of deeds in that county, to exclude a conclusion that it was made to meet the case of a deed without an accompanying bond. That proof was given in the case in hand.

In Cuttle *v.* Brockway, 12 Harris 145, in an opinion by Black, C. J., it is said, " There is nothing to which the maxim *omnia præsumuntur rite esse acta* applies with so much force as to a tax title." After the lapse of time occurring in this case, aided as it is, by concurring and continuing facts consistent only with faith in a perfect compliance with the laws, the maxim, we think, should be conclusive in the absence of contradictory testimony.

2. Taking the whole charge of the learned judge, as to what constitutes the character " seated" in regard to lands, we see no error. Residence with a bonâ fide intention to hold it as owner, or for the owner, and performing labor on it, such as mining coal, raising ore, and the like, in the character of owner, would undoubtedly give the land the character of seated. While on the other hand, the temporary residence of a trespasser to take off the timber, although it might justify treating the land as seated, and a call on him for the taxes, being in possession, it would not fix upon the tract the character of seated after he had left it. We see no error in this part of the charge taking it in the concrete.

3. The last assignment of error is in regard to what was said about the acts of Stevens.

No doubt but that if the case trying had been between Fales and Stevens, the charge would have been unexceptionable ; but whether the testimony bearing on Stevens was such, even if it might have been sufficient to avoid the sale as to him on account of fraud, was such as to charge the defendants with notice, is not clear. We do not see evidence of it in the paper-books. Yet in the charge there is a reference to an entry copied on the commissioner's books of 1850–51, at his instance, and to other facts, but which are not in the evidence on the paper-books.

The evidence is not certified by the judge, and we cannot tell whether we have it all or not. In this condition of the case we cannot say the learned judge charged without evidence on this point. In fact the charge did not notice the defendants at all. The jury was not instructed whether Stevens's fraud was to have any effect, and it is at most conjecture whether it had any effect at all in the case. But it was the duty of the counsel to have had the certificate of the judge, that the testimony brought up on the point was in full. If that had been done we would have seen whether there was any just ground of complaint or not. That was not done, and without that we cannot say there was no evidence. If there was error in the particular herein referred to,

we have not the elements out of which to construct grounds for reversal, for the reasons given.

If, as is alleged, the taxes of 1852–53, assessed on this land, were paid on the seated list, the sale on the unseated list was void. This would also be the result if the land was actually seated. There was evidence on these points, and it was referred to the jury. We cannot tell on which ground the jury found their verdict, and hence the difficulty of the last point referred to above. It may have had a material bearing on the case in the minds of the jury, and may have had none. But certain it is, we cannot say there was error in the charge in regard to the facts for want of knowing whether we have them all or not. If the defendants think themselves aggrieved on this ground, they can only have it corrected by bringing suit and trying the case over again. We cannot say they were injured as the matter appears now.

Judgment affirmed.